**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Amelia Yankovich and Joseph Allen, *on behalf of themselves and all others similarly situated*, | : <br> : <br> : <br> : |
| Plaintiffs, | :   Civil Action No. 3:21-cv-00720-KAD |
| vs. | : <br> : |
| Applus Technologies, Inc., | : <br> : |
| Defendant. | : <br> : |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(1) AND 12(B)(6)

Plaintiffs Amelia Yankovich and Joseph Allen ("Plaintiffs"), by and through undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Defendant Applus Technologies, Inc.'s ("Applus" or "Defendant') Motion to Dismiss.

## INTRODUCTION

Plaintiffs each entrusted sensitive personally identifiable information ("PII") to Applus, Applus had a duty under Connecticut law to protect such information, Applus breached that duty by failing to maintain reasonable data security procedures and practices leaving itself open to a malware attack which compromised Plaintiffs' PII. As a result, Plaintiffs now and for the rest of their lives face an imminent, heightened, and substantial risk of identity theft and other fraud.

In its motion to dismiss, Applus has raised no legitimate argument for dismissal. Although it has refused to disclose to the public or Plaintiffs[1] the scope of the data breach or the extent to which personally identifiable information was compromised, Applus now claims that it only maintains public information about Plaintiffs. But Plaintiffs plead that confidential PII was

---

[1] Indeed, during the Parties' conferrals prior to Applus' motion to dismiss, Applus refused to produce the results of its investigation into the data breach.

compromised in the breach, they have not been able to take any discovery regarding Applus' contentions to the contrary, and in any event courts have held that even the disclosure of the allegedly public information that Applus claims was at issue can confer Article III standing and place consumers at an increased risk of identity theft and fraud. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019); *In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at *7 (S.D.N.Y. Aug. 4, 2021). In addition, Applus had a duty to protect such information under Connecticut law notwithstanding its claims to the contrary. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2020 WL 6290670, at *12 (D. Md. Oct. 27, 2020), *reconsideration denied sub nom. In re Marriott Int'l, Inc.*, 2021 WL 1516028 (D. Md. Apr. 16, 2021) (third party entrusted with personally identifiable information had a duty under Connecticut law to protect such information). Further, the economic loss rule is inapplicable to Plaintiffs' negligence claims for several independent reasons (Applus' duty to protect the personally identifiable information arose from its common law tort duty; this case does not involve the sale of goods, product liability claims or commercial actors; and Plaintiffs plead non-economic losses). And Plaintiffs have stated a claim for breach of an implied contract.

Finally, in a cynical attempt to support its contention that only public information was compromised in the data breach, Applus doubled-down on its improper disclosure of PII and submits a declaration from its counsel disclosing, once again, sensitive PII about the Plaintiffs including the Plaintiffs' complete dates of birth. (*See* Doc. No. 12-3). The filing of this Declaration is a violation of this Court's Electronic Filing Policies and Procedures, which prohibit the filing of unredacted sensitive information, including complete dates of birth.[2]

For each of the following reasons, Plaintiffs respectfully request that the Court deny

---

[2] *See* https://www.ctd.uscourts.gov/sites/default/files/Electronic-Filing-Policies-and-Procedures-10-11-18.pdf at p. 7 (last visited Sept. 10, 2021).

Defendant's motion to dismiss in in its entirety.

## BACKGROUND

Defendant Applus is a Wisconsin corporation that manages, maintains and services Connecticut vehicle inspection and emissions testing facilities. (Doc. No. 1 ("Compl.") ¶ 14). Plaintiffs are Connecticut residents who had active driver's licenses issued by the CT DMV, owned personal motor vehicles registered with the CT DMV, and who each provided Applus with personally identifiable information ("PII) to Applus. (Compl. ¶¶ 12-13, 15). Specifically, Plaintiffs' vehicles each underwent vehicle inspection and emissions testing at facilities managed, maintained, and serviced by Applus and in connection with their vehicle registrations and inspections, "Plaintiffs were each required to provide certain personal and financial information to Applus, including their name, address, date of birth, Personal Identification Number, Social Security Number, driver's license number, and license plate number." *Id.* ¶¶ 16-17.

On March 30, 2021, Applus disclosed that it had been the subject of a malware attack (the "Data Breach"), which prompted Applus to shut down its vehicle inspection and emissions testing programs in Connecticut as well as several other states. Compl. ¶¶ 3, 18. In the wake of the Data Breach, Applus announced that it had retained computer forensic experts to analyze the Data Breach and "determine the scope of the attack and whether or not any personal information has been compromised." *Id.* ¶ 19. Applus further recommended that the public "monitor your financial accounts for any unauthorized activity and alert authorities and your bank if you see anything unusual." *Id.* ¶ 20.

Although Applus has not disclosed the type of malware used during the Data Breach, news reports note that "Applus was likely targeted by a ransomware attack" and in such a

scenario "the ransomware operation likely stole data during the attack, which based on the type of company, could include information about vehicles and their owners." Compl. ¶ 21; *see also* ¶ 22 ("these databases have your vehicle identification number, they've got your license plate number, they've got your name and address, all information that would be valuable to someone."). In addition, Applus has reported that it is "investigating the scope of the malware attack," but it "has not disclosed the results of its investigation, nor has it disclosed the extent to which Connecticut vehicle owners' PII was impacted during the Data Breach." Compl. ¶¶ 23-25.[3]

However, "in light of the information Applus has publicly disclosed about the Data Breach to date," e.g., its disclosure that it has been the victim of a malware attack, its recommendation that the public "monitor your financial accounts for any unauthorized activity and alert authorities and your bank if you see anything unusual," and its admission that it opened an investigation into the Data Breach and the extent to which personal information was compromised, "it is reasonably certain that the cybercriminals responsible for the malware attack on Applus deliberately stole PII during the Data Breach." Compl. ¶ 17-20, 27. Indeed, "[d]uring data breaches like the one at issue here, cybercriminals commonly engage in so-called 'double extortion' where they both encrypt and lock up the victim's data and separately steal the data and threaten to make it public if the victim does not pay a ransom." *Id.* ¶ 26.

Plaintiffs' and putative class members' "PII impacted by the Data Breach is of great value to hackers and cyber criminals" as the PII "can be sold on the 'dark web' to other criminals, and can be used in a variety of unlawful manners, for instance applying for credit cards, obtaining employment, obtaining a loan, filing false tax returns, obtaining medical care,

---

[3] Indeed, during conferrals between the Parties to this action, Applus has refused to disclose the results of its investigation.

stealing Social Security or other government benefits, or applying for a driver's license, birth certificate, or other public document." Compl. ¶ 28.

The Data Breach was and/or should have been foreseeable to Applus "in light of the publicized wave of data breaches in recent years."[4] Compl. ¶ 30. Indeed, "Applus knew that given the size and scope of the PII it collects, manages, and maintains, and given the prevalence of cyberattacks on similar entities, that Applus was the target of security threats, and understood or should have understood the risks posed by unsecure data security practices and systems." *Id.* Compl. ¶ 31.

Moreover, Applus "had a duty to Plaintiffs and Class members to properly secure their PII, encrypt and maintain such information using industry standard methods, train their employees, utilize available technology to defend their systems from invasion, and act reasonably to prevent foreseeable harm to Plaintiff and Class members." Compl. ¶ 32. This duty "arose as a result of the special relationship that existed between Applus and Plaintiffs and the Class Members, because Plaintiff and members of the Class entrusted Applus with their PII as part of the vehicle registration and inspection processes and requirements in Connecticut." *Id.*

Despite the fact that "Applus was at all times aware of its obligations to protect the PII of Connecticut vehicle owners and of the significant consequences that would result from its failure to do so," Compl. ¶ 33, and that "Applus had the resources necessary to prevent the Data Breach," *id.* ¶ 32, Applus "breached its duty owed to Plaintiffs and Class members and failed to maintain reasonable data security procedures and practices, resulting in the Data Breach." *Id.* ¶ 34; *see also* ¶ 29 ("Applus failed to maintain the confidentiality of the PII entrusted to it, failed

---

[4] "According to one recent report, in 2020 alone nearly 2,400 U.S.-based governments, healthcare facilities, and schools were the victims of ransomware, and one cyber insurance firm observed a 260% increase in ransomware attacks in the first half of year 2020." Compl. ¶ 30.

to prevent cybercriminals from accessing and using the PII, failed to avoid accidental loss, disclosure, or unauthorized access to PII, failed to prevent unauthorized disclosure of PII, and failed to maintain security measures consistent with industry standards for the protection of PII.").

As a result of the Data Breach, Plaintiff and Class Members' PII are now in the hands of unknown hackers who either have or may use the PII at a later date or resell it, and Plaintiffs and Class Members now and for the rest of their lives face an imminent, heightened, and substantial risk of identity theft and other fraud." Compl. ¶ 35[5]; *see also* ¶ 5 (the PII "can be used to gain unlawful access to the users' online accounts, can be used to carry out identity theft or commit other fraud, can be disseminated on the internet and be available to those who broker and traffic in stolen PII."). Thus, "as a direct and proximate result of Applus' actions and inactions, Plaintiff and Class Members have been injured and damaged, including but not limited to the increased risk of identity theft and identity fraud, improper disclosure of PII, and the ensuing time and expense necessary to mitigate, remediate, and sort out the increased risk of identity theft resulting from the Data Breach." *Id.* ¶ 36.

On May 26, 2021, Plaintiffs filed their Class Action Complaint against Applus asserting causes of action for Negligence (Count I) and Breach of Implied Contract (Count II). (Doc. No. 1). On August 12, 2021, Applus filed its Motion to Dismiss. (Doc. No. 12). This Opposition follows.

---

[5] Applus refuses to disclose the results of its investigation into the Data Breach or the scope of the Data Breach, and thus Plaintiffs make this allegation "upon information and belief" in an abundance of caution.

**ARGUMENT**

I. **PLAINTIFFS HAVE ARTICLE III STANDING**

    a. **Plaintiffs Suffered an Injury in Fact**

Plaintiffs have Article III standing to pursue their claims based on their increased risk of identity theft and fraud as a result of the Data Breach. Earlier this year, the Second Circuit addressed the Article III standing requirement that a plaintiff must suffer an injury in fact and "join[ed] all of [its] sister circuits that have specifically addressed the issue in holding that plaintiffs may establish standing based on an increased risk of identity theft or fraud following the unauthorized disclosure of their data." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 300–01 (2d Cir. 2021). In so holding, the Court explained that "requiring plaintiffs to allege that they have already suffered identity theft or fraud as the result of a data breach would seem to run afoul of the Supreme Court's recognition that '[a]n allegation of future injury may suffice' to establish Article III standing 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id.,* 995 F.3d at 300 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

In *McMorris* the Second Circuit identified three factors that courts should consider when "confronted with allegations that plaintiffs are at an increased risk of identity theft or fraud based on an unauthorized data disclosure" in order to determine "whether those plaintiffs have adequately alleged an Article III injury in fact: (1) whether the plaintiffs' data has been exposed as the result of a targeted attempt to obtain that data; (2) whether any portion of the dataset has already been misused, even if the plaintiffs themselves have not yet experienced identity theft or fraud; and (3) whether the type of data that has been exposed is sensitive such that there is a high

risk of identity theft or fraud." *McMorris*, 995 F.3d at 303. Applying those factors to the allegations here establish that Plaintiffs have sufficiently plead an Article III injury in fact.

First, the Data Breach was not an accident or inadvertent disclosure. Instead, it was the result of a malware attack on Applus in an attempt to steal PII. Compl. ¶¶ 18-19, 21-22. This is in stark contrast to the data breach at issue in *McMorris* which was the result of one of the defendant's employees "accidentally sen[ding] an email to all of the approximately 65 employees at the company" that contained personally identifiable information about the defendant's employees. *McMorris*, 995 F.3d at 298; *see id.* at 303 ("Far from being a 'sophisticated' or 'malicious' cyberattack 'carried out to obtain sensitive information for improper use,' . . . this case merely involves the inadvertent disclosure of PII due to an errant email sent to approximately 65 employees."). Because the Data Breach was the result of a deliberate cyberattack on Applus to obtain PII for an improper purpose, not an accidental disclosure of PII, this factor strongly weighs in favor of finding Plaintiffs have Article III standing. *See In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at *6 (S.D.N.Y. Aug. 4, 2021) (first *McMorris* factor weighed in favor of finding that Plaintiff had standing because "the Data Breach was the result of a phishing attack — in other words, a 'targeted attempt to obtain' the GE employee data held by Canon.").

The second factor – whether any portion of the dataset has already been misused, even if the plaintiffs themselves have not yet experienced identity theft or fraud – also supports Plaintiffs' standing. Although Plaintiffs themselves do not allege that they have already experienced identity theft or fraud as a result of the Data Breach, the data has already been misused as Plaintiffs' PII is "now in the hands of unknown cybercriminal hackers who either have or will use the PII at a later date or resell it, and Plaintiffs and Class Members now and for

the rest of their lives face an imminent, heightened, and substantial risk of identity theft and other fraud." Compl. ¶ 35. Further, in light of the size and scope of data in Applus' possession at the time of the Data Breach – which includes information on the owners of every vehicle subject to inspections and emissions testing in the State of Connecticut – and the fact that such PII is in the possession of parties who "either have or will use the PII at a later date or resell it" on the black market, it is highly likely that the dataset will continue to be misused. This second factor weighs in favor of finding that Plaintiffs have standing.

Third, the type of data exposed in the Data Breach – "their name, address, date of birth, Personal Identification Number, Social Security Number, driver's license number, and license plate number" (Compl. ¶¶ 16-17) – "is sensitive such that there is a high risk of identity theft or fraud." *McMorris*, 995 F.3d at 302-03 (describing "Social Security numbers and *dates of birth*" as "high-risk information" that, when "accompanied by victims' names – makes it more likely that those victims will be subject to future identity theft or fraud.") (emphasis supplied).

In its motion to dismiss, Applus submits the Declaration of Brad Zygmunt, a Software Development Manager, who declares that he searched Applus' database for information about Plaintiffs and located the Plaintiffs' first and last names, their current and former addresses, their dates of birth, their genders, and certain unidentified "information" about their vehicles and the "emissions testing performed on the vehicle[s] by the inspection station." (Doc. No. 12-2 at ¶¶ 5-8). According to Applus, this information is publicly available and its "acquisition" "in a data breach is not an injury-in-fact giving rise to Article III standing." Def. Mem. at p. 10. Defendant is wrong. As an initial matter, at this stage of the lawsuit – where no discovery has commenced and Applus refuses to disclose pertinent details about the Data Breach or its investigation thereof – there is a serious imbalance of access to information and Plaintiffs are unable to verify the

accuracy of Applus' contentions regarding the scope of PII compromised during the Data Breach. However, even assuming for present purposes that Applus' assertions are correct regarding the type of PII compromised in the Data Breach, Applus is still wrong that the perpetrators' acquisition of such information allegedly does not place Plaintiffs or members of the putative class at an increased risk of injury.

In *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019), another data breach case involving hackers stealing personal information, the Court addressed and rejected a near-identical argument to the one Applus makes here. In that case, one of the plaintiffs provided defendant Facebook with their "name, email address, telephone number, date of birth, locations, work and education history, hometown, relationship status, and photographs," and Facebook argued that there was no risk of future identity theft based on the disclosure of the above information because "no sensitive information was taken." *Bass*, 394 F. Supp. 3d at 1033–34. However, the court explained that "the information taken . . . need not be sensitive to weaponize hackers in their quest to commit further fraud or identity theft" and that "the rightful injury-in-fact determination is not to look at the minutia of what information had been taken . . . but to specifically determine whether the data taken 'gave hackers the means to commit fraud or identity theft.'" *Id.* at 1034 (quoting *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027–29 (9th Cir. 2018)). The *Bass* court further explained that while a "social security number derives its value in that it is immutable," the same can be said for "someone's date of birth" or "hometown" which, if exposed in a data breach, is now information that can "forever be wielded to identify [that person] and target him in fraudulent schemes and identity theft attacks." *Id.* Moreover, if other information such as one's "name, email address, telephone number, locations, work and education history, relationship status, and photographs" gets in "the hands of nefarious actors,"

such information "will provide further ammo" to those bad actors. *Id.* "Put simply," the *Bass* court explained, the information taken from the plaintiff there gave hacker the means to commit fraud or identity theft and "[t]hat each strand of information can be painstakingly collected through a mishmash of other sources is irrelevant." *Id.* at 1034-35; *see also In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at *7 (S.D.N.Y. Aug. 4, 2021) (court followed reasoning in *Bass* and held that "an individual's email address, mailing address, telephone number, and employment information can 'provide further ammo' to nefarious actors").

Here, even assuming *arguendo* that Applus is correct regarding the extent of the PII compromised in the Data Breach, the information that Applus acknowledges was compromised in the Data Breach – dates of birth, full names, current and former addresses, genders, information about their vehicles – does place Plaintiffs at an increased risk of identity theft and fraud. Indeed, Plaintiffs' dates of birth are "immutable" and now can "forever be wielded to identify [Plaintiffs] and target [them] in fraudulent schemes and identity theft attacks" and the remaining disclosed personal information will provide "further ammo" to cybercriminals once it gets in their hands. *Bass*, 394 F. Supp. 3d at 1033–34.[6]

---

[6] The cases Applus cites to are inapposite in that they did not involve the disclosure of the same level of personal information as the Data Breach here or are otherwise not persuasive. *See* Def. Mem. at p. 11. For instance, neither *Fus v. CafePress, Inc.* nor *Jackson v. Loews Hotels, Inc.,* involved the disclosure of the plaintiff's date of birth. *Fus v. CafePress, Inc.*, 2020 WL 7027653, at *2 (N.D. Ill. Nov. 30, 2020) (disclosed information included email address, "city/state/zip" of the billing and shipping addresses (but not the complete address) and "the expiration month and year of the credit card used to make the purchase" but no other information about the credit card); *Jackson v. Loews Hotels, Inc.*, 2019 WL 2619656, at *3 (C.D. Cal. Jan. 4, 2019) (personal information included "her full name, email, phone number, and address"). And while the court in *In re VTech Data Breach Litig.*, was "unclear" as to "how the disclosure of plaintiffs' names, addresses, birthdates, and VTech account information would increase the risk of fraudulent transactions on plaintiffs' credit cards or fraudulent accounts being opened in their names," 2017 WL 2880102, at *4 (N.D. Ill. July 5, 2017), the *Bass v. Facebook, Inc.*, court correctly explained precisely how someone's date of birth or hometown could be "forever be wielded to identify [that person] and target him in fraudulent schemes and identity theft attacks" and that the

In in its efforts to establish that the PII compromised in the Data Breach allegedly does not place Plaintiffs at an increased risk of fraud or identity theft, Applus recklessly and cynically published Plaintiffs' PII once again. (*See* Doc. No. 12-3). Indeed, Applus submits a declaration from its co-counsel (the "Vogt Declaration") which states counsel "navigated to the website, www.truthfinder.com" which "holds itself out as 'one of America's most popular background checking services," and "obtained a report about each of the Plaintiffs in this case from trurthfinder.com" which "contains Plaintiff's names, mailing addresses, and dates of births" and attaches those reports in unredacted forms to the declaration. *Id.* But that Applus decided to publicize Plaintiffs' PII to the world does not change the fact that Plaintiffs are at an increased risk of identity theft and fraud as a result of the Data Breach.

As an initial matter, the Vogt Declaration violated this Court's Electronic Filing Policies and Procedures.[7] Those Policies and Procedures contain a "Privacy" section which provides that "[t]o address the privacy concerns created by internet access to Court documents, litigants should not include sensitive information in any document filed with the Court unless such inclusion is necessary and relevant to the case. If sensitive information must be included, the following personal data identifiers *must be partially redacted from the pleading*: . . . "4. Dates of birth to

---

remaining personal information was provide further ammo to such criminals. 394 F. Supp. 3d 1024. Further, in *re VTech Data Breach Litig.*, the court found that the plaintiffs did not sufficiently allege "their risk of identity theft increased due to the data breach" in light of an article cited in the complaint where "the hacker told the article's author that he did not intend to sell or publish the data" which lead the court to "call[ ] . . . into question [the assumption that "hackers steal consumers' private information to make fraudulent charges or assume those consumers' identities"] for purposes of th[at] litigation." *In re VTech Data Breach Litig.*, 2017 WL 2880102, at *4. But there is no reason to believe that the parties responsible for the Data Breach at issue here did not intend on taking the PII for fraud or identity theft purposes. Compl. ¶ 17-20, 26-27.

[7] *See* https://www.ctd.uscourts.gov/sites/default/files/Electronic-Filing-Policies-and-Procedures-10-11-18.pdf at p. 7 (last visited Sept. 10, 2021).

the year."[8]  Thus, this Court's own rules recognize that an individual's date of birth is "sensitive information" that should not be publicly disclosed and Applus violated these Policies and Procedures by willfully publicizing Plaintiffs' complete dates of birth.

In addition, the referenced website is not a background checking service and it is entirely unclear whether the information on the website was even obtained through lawful means.  In fact, the website goes out of its way to note that "[t]he information available on our website may not be 100% accurate, complete, or up to date, so do not use it as a substitute for your own due diligence"; "TruthFinder does not make any representation or warranty about the accuracy of the information available through our website or about the character or integrity of the person about whom you inquire"; and that users "may not use our service or the information it provides to make decisions about consumer credit, employment, insurance, tenant screening, or any other purpose that would require FCRA compliance. TruthFinder does not provide consumer reports and is not a consumer reporting agency."[9]  In short, the website does not change the fact that the PII at issue in the Data Breach was sensitive, does not provide Applus free reign to publicize highly sensitive PII, and the Vogt Declaration provides nothing more than 'further ammo' for the perpetrators of the attack to commit fraud.

Moreover, while Applus contends that the disclosure of Plaintiffs' and putative class members' PII is harmless because Connecticut's data breach notification statute does not include a person's name, date of birth, mailing address and gender as "personal information," Def. Mem. at p. 11 & n.5, a review of the Drivers Privacy Protection Act (DPPA) – a law that specifically addresses what information DMV contractors like Applus can release to the public – makes clear that the personal information compromised in the Data Breach *is* sensitive information that

---

[8] *Id.* (emphasis supplied).

[9] https://www.truthfinder.com/ (last visited Sept. 10, 2021).

should not have been disclosed.  That law prohibits a "State department of motor vehicles, and any officer employee, or *contractor* thereof" from making available to any person "personal information, as defined in 18 U.S.C. § 2725(3), about an individual obtained by the department in connection with a motor vehicle record . . . ." 18 U.S.C. § 2721(a) (emphasis supplied). "[P]ersonal information," in turn, is defined to include "information that identifies an individual, including an individual's . . . name [and] address (but not the 5-digit zip code) . . . ." 18 U.S.C. § 2725(3).  Where a federal statute specifically prohibits Applus from disclosing driver's names and addresses, Applus cannot now argue that such information is harmless and there is no risk in its disclosure.

Finally, Defendant's reliance on *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)  is misplaced. *See* Def. Mem. at pp. 12-13.  As another court recently explained in ruling on a motion to dismiss in a data breach case, *Ramirez* does not impact a court's injury-in-fact analysis at the motion to dismiss stage and Plaintiffs "should have the benefit of discovery before being required to 'factually establish' their injuries":

> In *Ramirez*, the Supreme Court "focuse[d] on the Article III requirement that the plaintiff's injury in fact be 'concrete' – that is, 'real, and not abstract.' " 141 S.Ct. at 2203-05. As the case before the court had proceeded to trial, the Supreme Court required that "the specific facts set forth by the plaintiff to support standing '... be supported adequately by the evidence adduced at trial.' " *Id.* at 2208 (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130). After examining the evidence presented at trial, the Supreme Court concluded that some of the plaintiffs failed to "factually establish" that their risk of future harm materialized into a sufficient "concrete" harm to satisfy the injury in fact requirement. *Id.* at 2212. Accordingly, it found that those plaintiffs lacked Article III standing. *Id.* at 2200. Here, all named Plaintiffs allege that they suffered an increased risk of future harm like the plaintiffs in *Ramirez*. *See supra* note 8. However, this case is procedurally distinguishable from *Ramirez* because the court does not have the "helpful benefit of a jury verdict" at this phase of the litigation. 141 S.Ct. at 2222 (Thomas, J., dissenting). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. Since the court must rely on the pleadings to resolve the instant Motion, the court is not in a position to discern whether Plaintiffs have

"factually establish[ed]" that their alleged risk of future harm materialized into a sufficient "concrete" harm as held in *Ramirez.* 141 S.Ct. at 2212. Such an inquiry may be appropriate after a proceeding on the merits but it is not proper at this juncture. Plaintiffs should have the benefit of discovery before being required to "factually establish" their injuries. *Id.*

*In Re Blackbaud, Inc., Customer Data Breach Litig.*, 2021 WL 2718439, at *6 (D.S.C. July 1, 2021) (emphasis supplied).   The Court in *Cotter v. Checkers Drive-In Restaurants, Inc.*, another data breach case where the Court found Article III standing based on a substantial risk of future injury, agreed.   It held that *Ramirez* "does not eviscerate [Plaintiffs'] own standing" because *Ramirez* "was decided at a different phase of litigation" and only involved statutory damages. *Cotter v. Checkers Drive-In Restaurants, Inc.*, 2021 WL 3773414, at *4 (M.D. Fla. Aug. 25, 2021) (citing *In re Blackbaud, Inc.*, 2021 WL 2718439, at *6 n.15). So too, here this case is at a different procedural posture (the pleading/motion to dismiss stage) than *Ramirez*, discovery has not commenced, Applus has refused to disclose pertinent information about or the scope of the Data Breach, and Plaintiffs seek, *inter alia,* compensatory damages and equitable relief.   *Ramirez* does not change the fact that Plaintiffs have sufficiently plead an injury-in-fact sufficient to withstanding Defendant's motion to dismiss.

To the extent Defendant relatedly argues that Plaintiffs' claims must be dismissed because they seek both compensatory damages and equitable relief (e.g., "Requiring Applus to provide appropriate credit monitoring services to Plaintiffs and the other class members" and "injunctive and declaratory relief as appropriate"), *see* Def. Mem. at pp. 12-13, Defendant is mistaken.   Rule 8 allows plaintiffs to plead in the alternative, *see* Fed. R. Civ. P. 8, "[l]egal and equitable grounds may be pled alternatively, or even inconsistently," and while "as a general proposition, if plaintiffs have an adequate remedy at law they cannot obtain equitable relief, it is too early to dismiss claims seeking solely equitable relief" at the motion to dismiss stage. *In re*

*Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *29 (E.D.N.Y. Aug. 29, 2013) (collecting cases ) (internal citations omitted); *see also Freydl v. Meringolo*, 2013 WL 1285286, at *11 (S.D.N.Y. Mar. 29, 2013) ("the fact that Defendants assert monetary damages does not automatically convert their claim into one that possesses an adequate remedy at law").

For each of the foregoing reasons, Plaintiff have sufficiently alleged an injury-in-fact based on their increased risk of identity theft and fraud.

### b.  Plaintiffs' Injuries Are Fairly Traceable to Defendant's Conduct

Plaintiffs allege that Applus "failed to maintain reasonable data security procedures and practices, resulting in the Data Breach." Compl. ¶ 34, and specifically "failed to maintain the confidentiality of the PII entrusted to it, failed to prevent cybercriminals from accessing and using the PII, failed to avoid accidental loss, disclosure, or unauthorized access to PII, failed to prevent unauthorized disclosure of PII, and failed to maintain security measures consistent with industry standards for the protection of PII," *id.* ¶ 29.  As a result, Plaintiff and Class Members' PII was taken, has or will be misused, and thus "Plaintiffs and Class Members now and for the rest of their lives face an imminent, heightened, and substantial risk of identity theft and other fraud." Compl. ¶ 35.  Accordingly, "as a direct and proximate result of Applus' actions and inactions, Plaintiff and Class Members have been injured and damaged, including but not limited to the increased risk of identity theft and identity fraud, improper disclosure of PII, and the ensuing time and expense necessary to mitigate, remediate, and sort out the increased risk of identity theft resulting from the Data Breach." *Id.* ¶ 36.  And in their Demand for Relief, Plaintiffs request, *inter alia,* compensatory damages and equitable and injunctive relief such as an Order requiring that Defendant "provide appropriate credit monitoring services to Plaintiffs and other class members." Compl. at p. 15.  These allegations are sufficient to show causation

and redressability. *See In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at \*4 n.2 (allegations that plaintiff's injuries are "'fairly traceable' to Defendants' actions in collecting and storing PII without following proper data security principles or implementing adequate cyber security measures" satisfied the requirements of causation and redressability; Court "conclude[d] that 'it is likely and not merely speculative that the plaintiff's injury will be remedied' by the damages and other forms of relief sought.") (quoting *Sprint Commc'ns Co., L.P.* v. *APCC Services, Inc.*, 554 U.S. 269, 273 (2008)).

Notably absent from Defendant's motion are any assertions that the Data Breach did not actually occur, the Data Breach was not the result of a deliberate attempt to take personally identifiable information, or that such information was not actually taken. *See* Def. Mem. Instead, Defendant recycles its argument that Plaintiffs have allegedly not suffered an injury-in-fact and asserts that it has "rebutted" Plaintiffs' allegations that sensitive PII was compromised in the Data Breach and that such information was stolen and misused because, according to Defendant's untested Declaration, Defendant only maintained publicly available information about the Plaintiffs. *See* Def. Mem. at pp. 13-14. But as discussed, the scope of the Data Breach has not been disclosed or determined, Plaintiffs have not yet had an opportunity to take any discovery regarding the Data Breach or Defendant's contentions that only certain PII was disclosed, and even assuming *arguendo* that Defendant is correct, the disclosure of Plaintiffs' dates of birth, full names and complete addresses along with other personal information placed Plaintiffs at an increased risk of identity theft and harm. In short, Defendants' untested contentions that only public information was disclosed in the Data Breach does not negate Plaintiffs' well-pleaded allegations that their injuries were proximately caused by the Defendant and can be redressed via this lawsuit.

## II.    PLAINTIFFS HAVE STATED A NEGLIGENCE CLAIM

### a.    Defendant Had a Duty to Safeguard Plaintiffs' Personal Information

The Court should reject Defendant's argument that it had no duty to safeguard the sensitive personally identifiable information entrusted to it.

First, Defendant claims that Connecticut does not recognize "a general tort duty to protect another's personal information" and in support cites an unreported decision for the proposition that "Connecticut courts have concluded there is 'no actionable common-law duty . . . for a merely negligent disclosure of confidential health information." Def. Mem. at p. 15 (quoting *Doe v. Abriola*, 2016 WL 8488118, at *7 (Conn. Super. Ct. Nov. 14, 2016)). However, in 2018 the Supreme Court of Connecticut addressed the "question of whether to recognize a common-law cause of action for breach of the duty of confidentiality of medical records by a health care provider" which was a question "of first impression in th[at] court" and "conclude[d] that a duty of confidentiality arises from the physician-patient relationship and that **unauthorized disclosure of confidential information obtained in the course of that relationship for the purpose of treatment gives rise to a cause of action sounding in tort** against the health care provider . . . ." *Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.*, 327 Conn. 540, 557 & 567–68 (2018) (emphasis supplied). Thus Connecticut courts have recognized a common law duty and related cause of action sounding in tort based on the negligent disclosure of confidential information.

Moreover, courts have applied Connecticut law in data breach cases and have likewise found that a duty exists. For instance, in *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, the Court extensively reviewed Connecticut law before concluding that a third party entrusted with the plaintiffs' PII had a duty under Connecticut law to protect that information. It

explained that under Connecticut law "[t]he existence of a duty is a legal conclusion that begins with a threshold inquiry: 'whether the specific harm alleged by the plaintiff was foreseeable to the defendant.'" *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2020 WL 6290670, at *12 (D. Md. Oct. 27, 2020), *reconsideration denied sub nom. In re Marriott Int'l, Inc.*, 2021 WL 1516028 (D. Md. Apr. 16, 2021) (quoting *Mirjavadi v. Vakilzadeh*, 310 Conn. 176, 191, 74 A.3d 1278, 1288 (2013)). In addition to a finding of foreseeability, the "'test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.'" *Id.* (citing *Mirjavadi*, 74 A.3d at 1288).

Here, as in *In re Marriott Int'l, Inc.,* Plaintiffs have sufficiently pleaded that the specific harm alleged by the Plaintiffs (the Data Breach) was foreseeable to Applus. They allege that "[t]he Data Breach was and/or should have been foreseeable to Applus in light of the publicized wave of data breaches in recent years"; indeed one recent report found that "in 2020 alone nearly 2,400 U.S.-based governments, healthcare facilities, and schools were the victims of ransomware" and that there was a "260% increase in ransomware attacks in the first half of year 2020." Compl. ¶ 30. Given "the prevalence of cyberattacks on similar entities" and "the size and scope of the PII [Applus] collects, manages, and maintains" Applus knew that it "was the target of security threats, and understood or should have understood the risks posed by unsecure data security practices and systems." *Id.* ¶ 31. Indeed, Applus was aware of its "the significant consequences that would result from" Applus' failure to protect the PII of Connecticut vehicle

owners, *id.* ¶ 33, "[i]t was reasonably foreseeable to Applus that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII," *id.* ¶ 50, and "[o]nly Applus was in a position to ensure that its systems were sufficient to protect against the harm to Plaintiffs and the Class members from a data breach." *Id.* ¶ 48. Thus, in light of "the special relationship that existed between Applus and Plaintiffs and the Class Members, because Plaintiff and members of the Class entrusted Applus with their PII as part of the vehicle registration and inspection processes and requirements in Connecticut," Applus had a "duty to Plaintiffs and Class members to properly secure their PII, encrypt and maintain such information using industry standard methods, train their employees, utilize available technology to defend their systems from invasion, and act reasonably to prevent foreseeable harm to Plaintiff and Class members." *Id.* ¶ 32. However, Applus breached this duty owed by "fail[ing] to maintain reasonable data security procedures and practices, resulting in the Data Breach." *Id.* ¶ 34. Accordingly, the specific harms Plaintiffs complain about here arising from the Data Breach were foreseeable to Applus and it had a duty to protect Plaintiffs' and putative class members' PII. *See In re Marriott Int'l, Inc.* 2020 WL 6290670, at *13 (Connecticut plaintiff sufficiently pleaded defendant's negligence caused foreseeable harm and that Plaintiff was a foreseeable victim in light of allegations that defendant recognized that plaintiff and members of putative class were "foreseeable victims of a data breach").

Further, a public policy analysis also supports a finding that such a duty exists. "Connecticut courts hold that the first policy factor, the expectations of the parties, weighs in

favor of the plaintiff when the harm is not ancillary to the defendant's actions and when the plaintiff does not already have a statutory remedy." *In re Marriott Int'l, Inc.,* 2020 WL 6290670, at *13. In *In re Marriott Int'l, Inc.,* the court found that "the Connecticut Consumer Plaintiff Amarena has sufficiently alleged facts to establish that the expectations-of-the-parties factor weighs in favor of finding that Accenture owed her a duty of care" and that the defendant's negligence was "not remote, attenuated, or indirect," because the third-party defendant agreed to "adhere to a reasonable standard of care when protecting the personal identifying information that Marriotts' guests disclosed during their on-line contact with Marriott," when it failed to do so, the plaintiff "suffered injuries directly connected with that alleged breach," the plaintiff "expected that her personal data would be adequately protected and stored" and "there is no Connecticut statutory remedy that the Consumer Plaintiff could assert to recover for Accenture's negligence." *Id.* at *14. Likewise, in this case Plaintiffs' injuries are not ancillary to the defendant's actions. Plaintiffs allege that when they entrusted their PII with Applus in connection with their vehicle registrations, inspection and emission testing performed by Applus, Applus agreed to sufficiently protect the PII consistent with industry standards and its duty "to use ordinary care in activities from which harm might be reasonably anticipated, such as in the storage and protection of PII within Defendant's possession, custody, and control and that of its vendors." Compl. ¶¶ 29, 32, 46. Plaintiffs additionally allege that as a direct result of Applus' failure to do so, Plaintiffs were injured and that "[b]ut for Applus' negligent breach of the above-described duties owed to Plaintiffs and Class members, their PII would not have been released, disclosed, and disseminated without their authorization." *Id.* ¶¶ 34-36, 53-55. And here too, "there is no Connecticut statutory remedy that [Plaintiffs] could assert to recover for [Applus'] negligence." *In re Marriott Int'l, Inc.,* at *14.

The remaining public policy factors likewise support a finding that Applus had a duty to protect Plaintiffs' PII. A finding that under Connecticut law Applus owes a tort duty to Plaintiffs and the putative class "would produce a corresponding increase in consumer safety" because absent such a finding, Connecticut consumers would have no recourse against a company that agreed to take reasonable measures to protect their personal financial information; and "recognizing a tort duty of care owed to the consumer plaintiffs would incentivize [Applus] to up its game" when fulfilling its obligations to protect personal information provided to it by Plaintiffs and the Connecticut DMV and "[t]his would result in fewer data breaches, and fewer data breach lawsuits." *In re Marriott Int'l, Inc.*, 2020 WL 6290670, at *15. Accordingly, Applus had a duty to Plaintiffs to protect their personal information under Connecticut law.

### b. Plaintiffs' Negligence Claim is Not Barred by the Economic Loss Rule

Applus argues that "if the Court concludes that Plaintiffs have adequately alleged a claim for breach of contract, Plaintiffs' negligence claim is foreclosed by Connecticut's economic loss rule." Def. Mem. at p. 16. To the contrary, the economic loss rule is inapplicable here for several reasons.

First, although Plaintiffs assert that Applus breached an *implied* contract, Plaintiffs do not allege that they entered into any actual contracts with Applus. *See* Compl. Nor do they allege that Applus' duty to Plaintiffs arises exclusively from a contractual relationship between the parties; instead they allege that there is a common law duty to protect the PII entrusted to Applus. Under these facts, the economic loss rule is inapplicable. *See Aliki Foods, LLC v. Otter Valley Foods, Inc.,* 726 F. Supp. 2d 159, 165 (D. Conn. 2010) ("The economic loss doctrine, in essence, holds the aggrieved party to the bargain it struck in its contract by preventing it from bringing a tort action for what is really the breach of a contractual duty. This protects the parties'

expectancy interests and encourages them to build cost considerations into their contracts in the first place."); *In re Marriott Int'l, Inc.*, 2020 WL 6290670, at *13 (Connecticut economic loss rule "does not bar tort claims that arise from conduct independent of the contract.").

Second, "[n]o appellate court in Connecticut has held that a plaintiff may not recover for economic losses when the relationship is contractual in nature other than in actions where the claim is based on product liability and the sale of goods." *Milltex Properties v. Johnson*, 2004 WL 615748, at *5 (Conn. Super. Ct. Mar. 15, 2004). Indeed, the economic loss rule "generally applies only to contracts for the sale of goods." *Aliki Foods, LLC*, 726 F. Supp. 2d at 165–66. However, this case does not involve product liability claims or the sale of goods.

Third, "the doctrine only applies in situations where the injured party alleges purely economic losses relating to the goods themselves" and "[t]hus, the economic loss doctrine does not generally bar recovery in tort if the plaintiff alleges either personal injury or damage to property other than the goods for which the parties contracted." *Aliki Foods, LLC*, 726 F. Supp. 2d at 165. Here, Plaintiffs allege non-economic injuries such as the "time . . . necessary to mitigate, remediate, and sort out the increased risk of identity theft resulting from the Data Breach." Compl. ¶ 36. Thus the rule is inapplicable in this case. *See Bass*, 394 F. Supp. 3d at 1039 ("plaintiff alleged his loss of time as a harm and so does not allege pure economic loss. The economic loss rule therefore does not apply.").

Finally, some Connecticut courts "have limited the economic loss doctrine to situations where both the plaintiff and the defendant are sophisticated commercial parties." *Aliki Foods, LLC*, 726 F. Supp. 2d at 167. However, here Plaintiffs are individuals who entrusted their PII to Applus, not commercial parties. For each of the foregoing reasons, the economic loss rule is inapplicable here.

### c. Plaintiffs Were Injured by Defendant's Negligence

As discussed in Section I(a) above, Plaintiffs each suffered an injury-in-fact as a result of Applus' negligence, and thus the Court should reject Defendant's contention that Plaintiffs have not plead damages. *See In re Marriott Int'l, Inc.*, 2020 WL 6290670, at *24 (finding that "Plaintiffs had established that they suffered injury-in-fact sufficient for Article III standing" is "also . . . sufficient to show that the Plaintiffs adequately pleaded that they suffered injury."). And Plaintiffs allege more than just Applus' improper disclosure of their PII or "harm that has not yet materialized." *See* Def. Mem. at p. 17. They assert that as a result of Defendant's negligence, their PII is already "in the hands of unknown cybercriminal hackers *who either have* or will use the PII at a later date or resell it, and Plaintiffs and Class Members *now* and for the rest of their lives face an imminent, heightened, and substantial risk of identity theft and other fraud." Compl. ¶ 35. Thus, "as a direct and proximate result of Applus' actions and inactions, Plaintiff and Class Members have been injured and damaged, including but not limited to the increased risk of identity theft and identity fraud, improper disclosure of PII, and the ensuing time and expense necessary to mitigate, remediate, and sort out the increased risk of identity theft resulting from the Data Breach." *Id.* ¶ 36. The Court should reject Defendant's contention that Plaintiffs have allegedly not plead an injury.

### III.   PLAINTIFFS HAVE STATED A BREACH OF IMPLIED CONTRACT CLAIM

Plaintiffs have sufficiently plead Applus' breach of an implied contract. They allege that "Applus required Plaintiffs and Class members to provide PII as a condition of registering their vehicles with the CT DMV and undergoing vehicle emissions testing managed, serviced, and performed by Applus" and "[i]n so doing, Plaintiffs and Class members entered into implied contracts with Applus by which Applus agreed to safeguard and protect such information, to

keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class members if their data had been breached and compromised, or stolen." Compl. ¶ 58. Further, Plaintiffs allege that they "fully performed their obligations under the implied contracts with Applus" *Id.* ¶ 59 – including entrusting Applus with their PII and completing and paying for their vehicle registrations and inspections - but that "Applus breached the implied contracts it made with Plaintiffs and Class members by failing to safeguard and protect their PII." *Id.* ¶ 60. As a direct and proximate result of the breach, Plaintiffs were injured. *Id.* ¶ 61.  Accordingly, Plaintiffs have plead Applus' breach of implied contract.  And while Applus argues that "to the extent that Plaintiffs' negligence claim survives dismissal, the breach of implied contract cannot move forward," Def. Mem. at p. 19, it once again misses the mark because Plaintiffs at this juncture may plead alternative or even inconsistent theories of liability. *See In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *29

## CONCLUSION

For each of the foregoing reasons, Applus' motion to dismiss must be denied in its entirety.  However, in the event that the Court finds otherwise, Plaintiffs respectfully request leave to amend their Complaint in order to cure any such deficiencies. *See* Fed. R. Civ. P. 15(a)(2) ("court should freely give leave [to amend] when justice so requires.").

Dated: September 16, 2021                    Respectfully submitted,


                                             By   /s/ Sergei Lemberg
                                             Sergei Lemberg
                                             LEMBERG LAW, LLC
                                             43 Danbury Road
                                             Wilton, CT 06897
                                             Telephone: (203) 653-2250
                                             Facsimile:  (203) 653-3424
                                             Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2021 a copy of the foregoing was served electronically by the U.S. District Court for the District of Connecticut Electronic Document Filing System (ECF) and that the document is available on the ECF system.

By /s/ Sergei Lemberg
Sergei Lemberg